Kathleen Marra **MOLE**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 19949.

United States Court of Appeals Fifth Circuit.

March 29, 1963.

3. Pattno v. United States, 10 Cir., 311 F.2d 604.

O. L. Crumbley, Macon, Ga., for appellant.

Truett Smith, Wilbur D. Owens, Jr., Asst. U. S. Attys., Floyd M. Buford, U. S. Atty., Macon, Ga., for appellee.

Before TUTTLE, Chief Judge, WOODBURY,* Chief Judge, and BELL, Circuit Judge.

GRIFFIN B. BELL, Circuit Judge.

Kathleen Mole, nee Marra, a native of Brooklyn, New York, who had never been in England nor in the Armed Forces, was convicted on a criminal information[1] charging violation of Title 18 U.S.C.A. § 703 in that she wore clothing and dress so nearly resembling a military uniform of a foreign nation with which the United States was at peace as to be calculated to deceive.

 The errors assigned, save one, are without merit. There is merit in the error assigned on the admissibility of the government's Exhibit 7 and we

---

* Chief Judge of the First Circuit, sitting by designation.

1. That on or about November 9, 1961, in the Macon Division of the Middle District of Georgia and within the jurisdiction of this Court, Kathleen Marra Mole did unlawfully, knowingly and wilfully, with intent to deceive and mislead, wear clothing and dress so nearly resembling a military uniform and decoration of a foreign state, nation and government with which the United States was at peace, namely, England, as to be calculated to deceive; all in violation of 18 U.S.C. 703.

must determine whether or not it is prejudicial. 28 U.S.C.A. § 2111.

That exhibit was offered for two purposes. The first was to show that appellant was not a member of the Women's Royal Air Force serving in the United States. This fact, if disputed at all, was otherwise proved overwhelmingly, and it follows that no error arises from the admission of this evidence.

The exhibit was also offered to show photographic reproductions of plates contained in the British Air Ministry Publication No. 1350 entitled "Dress Regulations for Officers". These reproductions, four in number, were attached to a letter from Wing Commander Fear of the RAF staff, British Embassy, Washington, D. C., which was in turn attached to a certification by the British Consul-General in this country to the effect that Wing Commander Fear was the staff officer in charge of administration of the RAF staff of the British Embassy in Washington, and that the photographic copies were genuine reproductions of the official British military uniform regulations. It is nowhere stated that the publication or plates were in this country, or that the Consul-General or the Wing Commander, one or the other, was the custodian. There was no authentication by an American consular officer. Cf. Banco De Espana v. Federal Reserve Bank, 2 Cir., 1940, 114 F.2d 438; and United States v. Grabina, 2 Cir., 1941, 119 F.2d 863 for similar evidentiary problems. This evidence was admitted, over objection, on the representation of the prosecutor that it was admissible under Rule 44, F.R.Civ.P., which is applicable in criminal cases under Rule 27, F.R.Crim.P.

Rule 44, like Title 28 U.S.C.A. § 1741 provides in substance that copies of an official foreign document or record may be admitted in evidence when certified by the lawful custodian thereof, and authenticated by a certificate of a consular officer of the United States resident in such foreign country, under the seal of his office, that the copy has been certified by the lawful custodian. Thus it is that this evidence was clearly inadmissible in the form in which it existed.

In deciding whether or not this is such a substantial or prejudicial error as to warrant a reversal, we must determine what the error meant to the jury in relation to all else that happened. Ahlstedt v. United States of America, 5 Cir., 1963, 315 F.2d 62. As we said in that case, quoting from Kotteakos v. United States, 1946, 328 U.S. 750, 66 S. Ct. 1239, 90 L.Ed. 1557:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand, except perhaps where the departure is from a constitutional norm of a specific command of Congress. * * *

> But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

Applying this test we first consider the information and the charge of the court. The court told the jury that it would be necessary for the prosecution to prove that the defendant wore the uniform. This was proven. Next, the prosecution had to prove that the act was done knowingly and with intent to deceive and mislead. There was sufficient evidence in this regard to form the basis of the jury verdict. Lastly, and this is crucial, it was necessary to prove that the dress or clothing worn so nearly resembled the military uniform of the friendly country that it was reasonably calculated to deceive. The evidence was sparse in this connection of resemblance

on the date set out in the information, November 9, 1961.

There was considerable evidence that the clothing resembled the military uniform to the extent that it was calculated to deceive on other occasions. However, as the court properly charged the jury:

"Now, there has been admitted in evidence in this case testimony concerning other instances than that specifically referred to in the information, on which occasions it is contended that the Defendant committed similar acts to the act specifically referred to in the information. I charge you that evidence that an act was done at one time or on one occasion is not any proof whatever that a similar act was done at another time or on another occasion. That is to say, evidence that a defendant may have committed an earlier act of a like nature may not be considered in determining whether the accused committed any offense charged in the information. Nor may evidence of alleged earlier acts of a like nature be considered for any other purpose, unless the jury first find that the other evidence in the case, standing alone, establishes beyond a reasonable doubt that the accused did the particular acts charged in the particular information under deliberation."

We turn then to the only evidence adduced on the trial regarding resemblance of the clothing to a British military uniform of any kind as it appeared on November 9.

Appellant, in the company of a female United States Air Force Lieutenant Colonel, attended a reception for an American General at the Idle Hour Country Club in Macon, Georgia, on November 8, 1961. There the Lieutenant Colonel introduced appellant to an American Naval Captain as Dr. Battenburg. Apparently all were in civilian clothes, and the Captain inquired as to whether Dr. Battenburg was a medical doctor practicing in Macon. She answered in the negative, saying that she was in the Royal Air Force. Appellant was also referred to as an Air Marshal. Later in the evening the Lieutenant Colonel told the Captain that she was very upset over the fact that appellant had received recruiting information from the Navy recruiting office in Macon in view of the fact that the presence of appellant in this country was not supposed to be known. The Captain became somewhat concerned because of the international implications, and commenced an investigation the next morning.

It developed that an enlisted WAVE recruiter, Miss Driskell, had sent the recruiting information pursuant to a telephonic request from one identifying herself as Jeanette Battenburg. The request was recorded at the time by the recruiting office including the telephone number of the calling party. The Captain telephoned this number. It turned out to be the home of the Air Force Lieutenant Colonel. The telephone was answered by a person identifying herself as a Group Captain with a French type name who explained that the Air Marshal was not in but who stated that Dr. Battenburg was indeed an Air Marshal of the Royal Air Force. This person referred to herself as a "bat woman" and then again as an aide-de-camp to the Marshal. The Captain, confused to say the least at this point, left word for the Air Marshal that the recruiting information had been forwarded by the recruiting office because of the telephone call received. Within half an hour the Air Marshal telephoned the Captain who repeated the story to her. She asked to talk to the WAVE recruiter in person, and in view of her rank, the captain volunteered to send Miss Driskell to her home.

Miss Driskell, in company with Chief Stephens who did not testify, arrived at the home where the Air Marshal was set up that afternoon. This is the critical time in the case as this is the only date involved in the information, and Miss Driskell is the only person who testified to seeing appellant in the uniform on that day.

Whatever evidence there is that the uniform resembled a British uniform must come from her testimony but, of course, it is buttressed by the fact that appellant represented herself, while wearing the uniform, to be an Air Marshal in the Royal Air Force. Miss Driskell testified that appellant answered the door dressed in the uniform which was in evidence. She identified the jacket, skirt and hat. She stated that the skirt was very similar in color and style to the WAF uniform of the United States Air Force. Appellant introduced herself as Air Marshal Battenburg and wanted to know why she had received the recruiting literature since she was in the British Air Force. Miss Driskell explained how it happened. The visit lasted only fifteen or twenty minutes and appellant gave Miss Driskell and Chief Stephens as momentos of the occasion a book entitled "Customs and Traditions of the Royal Navy", and two copies of "Navy News", the newspaper of the Royal Navy and of the Royal Naval Association.

The photographic reproductions in issue were then admitted in evidence over objection and shown to Miss Driskell. The copy of Plate 14 which is entitled "W.R.A.F. jacket and skirt" was handed to Miss Driskell with the request that she, as a lady, state whether or not the skirt of the uniform that appellant was wearing resembled that in the photograph. Her testimony then follows:

"A. No. This is a plain skirt and that in the back has pleats.

"Q. What about the jacket?

"A. It doesn't have the same type of pocket and the lapels are rounded, where this one is pointed.

"Q. But it does resemble?

"A. It resembles it but not close enough for—

"Q. It's not identical, in other words?

"A. No, it's not identical.

"Mr. Smith: [for the prosecution]

"That's all the questions I have, Your Honor please, for this witness."

It then became apparent on cross-examination that Miss Driskell was not familiar with the British uniform. The following questions and answers make this clear:

"Q. And this thing here, it didn't take you—as soon as you saw that, you knew that that was something pretty fishy all the way around, didn't you?

"A. No. Sir, because I didn't know who—because I had never seen a British Air Force uniform before.

"Q. That's right; you didn't walk in and say 'For Heaven's sake, there's a British Air Force uniform right there', did you?

"A. I wasn't sure at the time. I didn't know.

"Q. But you had serious, grave doubts, didn't you?

"A. Not at the moment, I didn't; not when I first met her, I had no reason to doubt her at the time. I realized afterwards, when you start thinking about various things.

"Q. That was when you reported it to the FBI, wasn't it?

"A. After we came back, yes."

The representations made to the Captain, and to Miss Driskell and Chief Stephens by appellant, the admissions made to the FBI agent, together with the uniform itself including the RAF insignia on it, made a sufficient case to go to the jury. However, the case for the government was greatly strengthened by the photographic reproductions of the British uniforms as they afforded the only basis of comparison of the uniforms with that worn by appellant. These reproductions were inadmissible as offered.

Taking the case as a whole, we do not have the necessary sure conviction that

this inadmissible evidence did not substantially sway the jury in reaching its verdict. For this reason, and so that appellant may have her day free of prejudicial error, a new trial must be granted.

Reversed and remanded for further proceedings not inconsistent herewith.