Donald K. BAINES, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 26163.

United States Court of Appeals,
Fifth Circuit.

May 13, 1970.

Steadman S. Stahl, Jr., of Varon, Stahl & Perlin, Hollywood, Fla., Louis J. DeReuil, Isley & DeReuil (court-appointed) Hugh G. Isley, Jr., Fort Lauderdale, Fla., for appellant.

Robert W. Rust, U. S. Atty., Donald I. Bierman, Asst. U. S. Atty., Miami, Fla., Johnnie M. Walters, Asst. Atty. Gen., Joseph M. Howard, John M. Brant, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before WISDOM, GEWIN, and AINSWORTH, Circuit Judges.

WISDOM, Circuit Judge:

Donald K. Baines, defendant-appellant, appeals from his conviction by a jury for willfully evading the payment of the federal cabaret sales excise tax imposed by 26 U.S.C. § 4231(6) of the 1954 Code.[1] This is the first and only case in which a taxpayer has ever been tried criminally for the offense of failing to pay the federal cabaret excise tax.[2] The trial took place in 1968, three years after the statute imposing the cabaret tax was repealed.[3]

The taxpayer and his wife, Wilma Jean Baines, were charged in an eight-

1. 26 U.S.C. § 4231 Imposition of Tax
There is hereby imposed:

(6) Cabarets.—A tax equivalent to 10 percent of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The tax imposed under this paragraph shall be returned and paid by the person receiving such payments. No tax shall be applicable under paragraph (1) or (2) on account of an amount paid with respect to which tax is imposed under this paragraph.

26 U.S.C. § 4232 Definitions
(a) Admission.—The term "admission" as used in this chapter includes seats and tables, reserved or otherwise, and other similar accommodations, and the charges made therefor.

(b) Roof Garden, Cabaret or Other Similar Place.—The term "roof garden, cabaret, or other similar place," as used in this chapter, shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. In no case shall such term include any ballroom, dance hall, or other similar place where the serving or selling of food, refreshment, or merchandise is merely incidental, unless such place would be considered, without the application of the preceding sentence, as a "roof garden, cabaret, or other similar place." Such term does not include any place if—

(1) no beverage subject to tax under chapter 51 (distilled spirits, wines, and beer) is served or permitted to be consumed;

(2) only light refreshment is served;

(3) where space is provided for dancing, no charge is made for dancing; and

(4) where music is provided or permitted, such music is (A) instrumental or other music which is supplied without any charge to the owner, lessee, or operator of such place (or to any concessionaire), or (B) mechanical music.

(c) Performance for Profit.—A performance shall be regarded as being furnished for profit for purposes of section 4231(6) even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of such performance.

2. So the appellant states in his brief.

3. 26 U.S.C. §§ 4232–4234 which imposed a tax on amusement and entertainment facilities and services was repealed on June 21, 1965, Pub.L.No. 89–44, § 301, 79 Stat. 145.

Events that occurred after the trial suggest that Baines has been pursued by the

count indictment with willfully attempting to evade the payment of that tax and filing false and fraudulent quarterly excise tax returns for all of 1961 and for the first three quarters of 1962. 26 U.S.C. § 7201. The taxpayer was separately charged with subscribing to a false excise tax return for the fourth quarter of 1961 in violation of 26 U.S.C. § 7206 (1).

At the close of the government's case, the district court granted the motions for judgment of acquittal as to Count IV, with respect to Mrs. Baines, and as to Count V, with respect to Baines. The court later denied motions for judgments of acquittal. The jury acquitted Mrs. Baines as to Counts I, II, and III and acquitted Baines as to Count II, but found him guilty as to Counts I, III, IV, VI, VII and VIII. The court denied all post-trial motions, and sentenced the taxpayer to three years as to Count I and to two years as to each other count, the two-year sentences to run concurrently with each other but consecutive to the three year sentence imposed as to Count I.

On appeal, Baines alleges that the trial court committed a number of reversible errors. Baines also questions whether the evidence was sufficient to show beyond a reasonable doubt that there was either a deficiency in the cabaret tax payments or that he willfully understated and underpaid the tax. This is a close point which we resolve in favor of submission of the case to the jury.

Because of the closeness of the case the Court feels compelled to hold, as we held in Marcus v. United States, 5 Cir. 1970, 422 F.2d 752, "that the cumulative effect of the District Court's errors, which are discussed in detail below, when taken together, require that this case be reversed and remanded to the District Court for a new trial, even though no single error, when viewed in isolation, would necessarily require this disposition. See Getchell v. United States, 5 Cir., 1960, 282 F.2d 681, 691." We limit our holding to the facts peculiar to this rare case involving the failure to pay federal cabaret excise taxes.

I.

Donald K. Baines operated "Porky's Hideaway" in Oakland Park, Florida. The establishment approaches the general public's loose notion of a "cabaret" as a place for entertainment where the music might be furnished by a band of musicians or by a juke-box, and where there might or might not be singing by professional entertainers and dancing by the customers.

In April 1958 two agents of the Internal Revenue Service visited Porky's Hideaway. They concluded that Baines had made certain sales subject to the cabaret excise tax. One of the agents explained to Baines that to avoid further violations his records should reflect the portion of the sales that would be subject to the excise tax. The agent suggested a cut-off time of 9:30 p. m. After that time the cabaret tax would apply to sales when there was either singing or dancing or sales made while space was made available for dancing. The agent informed Baines that if the dance floor was roped off or made unavailable for dancing, there would be no tax even if he had music.

Two weeks later the agents returned, unannounced, and found no violation, that is, that the establishment was not being operated as a cabaret. At the trial, one of the agents testified that there was neither singing nor dancing and that the dance floor was unavailable for dancing. He stated that an orchestra performed during the entire time he was present.

Furies. The City of Oakland Park took away his cabaret license; the mortgages foreclosed on Porky's Hideaway; the Internal Revenue Service took over his equity ($12,000) to apply it to jeopardy assessed excise tax and income tax assessments. Baines shot himself, became partially paralyzed as a result, and now carries a bullet in his head.

In January 1959, the agents made a third unannounced visit. Again they found no violation.

In accordance with a suggestion from the agents, Baines began to record his sales in four categories: "Before 9:30", "After 9:30", "Package", and "Subject to Amusement Tax". This last category was later abandoned when Baines began to record, in a separate notebook, those sales subject to the excise tax. The figures appearing in that notebook reflected the cost of entertainment, and indicated the nights and hours during which there was dancing. Based on these figures, Baines computed and paid the cabaret excise tax.

In March 1964 Revenue Agent Ted Williams asked and secured Baines's permission to examine his records. These included the sales journal containing those figures upon which the excise tax was determined. Williams continued to examine Baines's records for the next five months. In August 1964 he asked Baines to sign a previously prepared affidavit containing information relating to the reporting and filing of income tax returns and the reporting and filing of cabaret excise tax returns. Williams advised Baines that he was under no obligation to sign the affidavit. Baines signed it. In September 1964 Williams turned over the affidavit to the Intelligence Division along with the final report of his investigation. At the trial, over Baines's objection, that portion of the affidavit relating to the reporting and filing of the cabaret excise tax was admitted into evidence.

October 2, 1964, Special Agent John R. Harrison of the Intelligence Division accompanied Williams to Baines's home. After Harrison had fully identified himself, Baines permitted Harrison to review the sales records and to remove boxes of records. In March 1967 Donald K. Baines and his wife were indicted for willfully evading payment of the cabaret excise tax.[4]

The trial commenced on January 2, 1968. To find the defendants guilty, the government had to prove beyond a reasonable doubt that there was a substantial deficiency in tax owing and that the taxpayer willfully attempted to evade that tax. *E. g.*, Koontz v. United States, 5 Cir. 1960, 277 F.2d 53.

To prove the deficiency in the tax owing, the government had to establish that sales were made during the time when "Porky's Hideaway" was indeed a cabaret. The ten percent cabaret tax applied to amounts paid for admission, refreshments, service, or merchandise at a public place where music and dancing privileges or any other entertainment was being performed. The tax did not apply, however, to payments made while only instrumental or mechanical music was being played.

The government sought to prove the alleged deficiency by establishing that *all* sales that appeared in the "After 9:30" column of figures in Baines's records were sales that were subject to the cabaret tax. To support its position the government had to show that "Porky's Hideaway" was a cabaret from 9:30 in the evening until closing. The government introduced into evidence sixty-six entertainment employment contracts that Baines had entered into with various entertainment groups. But the government called only one of the 66 entertainers to testify. The contracts were

---

4. The tax debt is set forth in its indictment, as follows:

| Indictment | Tax Period | Tax per Return | Tax Due Per Indictment |
|---|---|---|---|
| Count One | 1st Q. 1961 | $ 462.00 | $ 1,990.89 |
| Count Two | 2nd Q. 1961 | 315.00 | 1,354.53 |
| Count Three | 3rd Q. 1961 | 180.00 | 1,156.05 |
| Count Four | 4th Q. 1961 | 210.00 | 1,299.78 |
| Count Six | 1st Q. 1962 | 280.00 | 2,245.54 |
| Count Seven | 2nd Q. 1962 | 137.00 | 1,713.13 |
| Count Eight | 3rd Q. 1962 | 142.00 | 1,000.89 |

offered through Porter R. Thomas, the Secretary-Treasurer of the Miami local of the American Federation of Musicians. Thomas initially testified out of the presence of the jury as to the general operations of the Union and its relation to the local entertainers. He testified that as each entertainment contract was received at the Miami office it was assigned a job number and that this number was posted on an individual account card. As each contract was completed, the office would then compute the amount that the individual member owed to the Union in the form of work dues. Three such account cards were offered into evidence in an effort to show that three performers had paid their work-dues after allegedly performing at "Porky's Hideaway".

On *voir dire* examination, Thomas testified that since each entertainer would pay his work-dues based upon performance, he had *assumed* each contract had actually been performed. He unequivocally stated, however, that he had no direct knowledge whether in fact any of the contracts had been performed and he was unable to tell from the contracts themselves whether the entertainers did in fact perform any services at Porky's Hideaway during 1961 and 1962.

The jury then returned and the government proceeded to have Thomas answer the same questions that were previously asked. After cross-examining Thomas, and again out of the presence of the jury, Baines's attorney moved to strike from the evidence all of the contracts that had previously been accepted on the ground that they constituted hearsay evidence in that the contracts themselves could not prove actual performance. The trial judge agreed that the contracts themselves could not prove performance; and government counsel agreed that as a matter of law the entering into a contract is not proof of its performance; nevertheless, the trial judge permitted the contracts to remain in evidence with an opportunity afforded opposing counsel to argue the point to the jury.

The government then called several witnesses who testified as to the type and the extent of entertainment that was performed at "Porky's Hideaway". Gene Sposato, the only entertainer called as a witness, was a musician who had sporadically performed at "Porky's Hideaway" during 1961 and 1962. He testified that he could not remember whether dancing was permitted while his group was performing or whether the dance floor had been made inaccessible to dancing.

Defense witness, Reno Cocchi, a musician, testified there were no dancing facilities when he played at Porky's Hideaway for a month during 1961. Kenneth Riley, another defense witness, established that during 1961 and part of 1962 there was no dancing in the dance areas because an instrumental calypso steel band was featured. No one could dance to that! On cross-examination by the prosecution, he stated that he saw "No Dancing" signs displayed. Defense witness Philip J. Salerno, a business competitor of "Porky's Hideaway", stated that the dance area was covered and that the "place wasn't danceable". Sidney Melton, a former employee of "Porky's Hideaway", established that the dance area, on occasion, was flooded with water, that probably once a week or two or three or four times a month, he would move tables and chairs back and forth from the dance area. On cross-examination, he too stated that "No Dancing" signs were posted. Defense witness Andrew Gurke established there were "no dance areas" because of tables and chairs which were "all over the place", and there were "No Dancing" signs. Other defense witnesses testified that there were no areas reserved for dancing; that "No Dancing" signs were exhibited; that chairs and tables were all over the whole place; that in 1961 and 1962 "Porky's Hideaway" was not known as a dancing place; that instead, it featured instrumental steel bands.

The government sought to introduce into evidence certain charts Special

Agent Harrison had prepared. One of these charts compared all sales made after 9:30 on each of the Saturday nights in 1961 and 1962 with the total sales on which the excise tax was paid for the same period of time. A second chart compared the total sales after 9:30 with the total sales on which the excise tax was paid and the amount of money expended for musical entertainment. The third chart was a graphic illustration of the second chart. Baines's attorney objected to the introduction of these charts on the ground that no evidence had been introduced upon which to base these charts.[5] The district court overruled the objection.

The government then sought to introduce into evidence Baines's excise tax returns covering those periods immediately preceding and following the indictment period to demonstrate that Baines had a long standing practice of reporting only a small portion of his "after 9:30" sales. The government also proffered into evidence certain Florida Sales Tax Returns that had been filed by the defendant. The government stated that the sales tax returns were not being offered to show that they were incorrect, but rather for comparison with the excise tax returns, apparently to demonstrate the discrepancy in tax payments. At an earlier point in the trial, the government offered the state sales tax returns to demonstrate the taxpayer's pattern of conduct as reflecting upon his attitude towards the payment of taxes. This latter proffer was made after Baines's former accountant testified that he had warned Baines that the state sales tax returns were too low.

Baines's attorney objected to the introduction into evidence of both the pre- and post-indictment excise tax returns and the Florida Sales Tax Returns. The court overruled both objections.

## II.

■ A. On appeal, Baines first argues that his affidavit was improperly admitted into evidence. This argument is predicated upon the allegation that when Baines signed the affidavit the focus of attention for possible tax fraud violations had centered upon him and that he had neither been warned nor advised of his constitutional rights.[6] Baines avers that the affidavit was obtained by Agent Williams at a time when Williams knew that the affidavit along with the results of his investigation would be forwarded to the Intelligence Division for possible criminal prosecution.

■ At the request of Baines's attorney, the district court, out of the presence of the jury conducted a hearing on this very point. After thoroughly questioning Agent Williams and after carefully reviewing Williams' preaffidavit memoranda concerning the Baines investigation, the district court concluded that the focus of attention had not centered upon Baines for *any* alleged criminal violation at that time and that Baines freely and voluntarily signed the affidavit. The court specifically found that at the time in question the revenue agent was conducting only a review of Baines's records and books and the status of his tax returns.

The argument that Baines advances here has been analyzed and answered by this Court in United States v. Prudden, 5 Cir. 1970, 424 F.2d 1021. See also United States v. Harry Davis d/b/a Davis Mfg. Co., 5 Cir. 1970, 424 F.2d 1241;

---

5. Baines's attorney later abandoned this ground for objecting to the introduction into evidence of these charts. The figures that appeared on the charts were those figures that were contained in Baines sales journal which had previously been introduced into evidence. The current basis for Baines's objection is discussed in part C, *infra*.

6. Although the evidence in question was obtained prior to the decision in *Miranda*, the Supreme Court applied that decision to persons whose trials had not begun as of June 13, 1966, regardless of when the alleged constitution infirmity occurred. Johnson v. New Jersey, 1966, 384 U.S. 719, 734, 86 S.Ct. 1772, 1781, 16 L.Ed.2d 882. Baines's trial began on January 2, 1968.

Marcus v. United States, 5 Cir. 1970, 422 F.2d 752; United States v. Jernigan, 5 Cir. 1969, 411 F.2d 471, cert. denied, 396 U.S. 927, 90 S.Ct. 262, 24 L.Ed.2d 225; Agoranos v. United States, 5 Cir. 1969, 409 F.2d 833, cert. denied, 396 U.S. 824, 90 S.Ct. 67, 24 L.Ed.2d 75.

We have carefully reviewed the transcript of the proceedings and are of the opinion that the district court did not err in admitting the affidavit into evidence.

B. At the commencement of the trial, the government stated that it intended to prove beyond a reasonable doubt a deficiency in the payment of the excise tax by establishing that almost all of the after 9:30 sales were made at a time after the musical entertainment and dancing had begun. To assist in substantiating its position the government, over the defendant's objection, introduced into evidence sixty-six musician's employment contracts. The defendant objected to the introduction into evidence of the contracts on the ground that the contracts constituted hearsay evidence and could not be used to establish the fact that musical entertainment had actually occurred. The government finally conceded that the contracts were not themselves proof of actual performance but still contended that they should be considered along with other circumstances to demonstrate that the contracts were actually performed. The district court agreed.

The evidence that was developed at trial created a genuine issue of fact as to whether musical entertainment *and* dancing had occurred at Porky's Hideaway. The government sought to establish this fact through a number of witnesses. These ranged from former employees to individuals who frequented the taxpayer's establishment to local law enforcement officers who patrolled the Oakland Park area. The defendant sought to refute the government's claim by attempting to impeach the testimony of the government witnesses and by affirmatively establishing through direct testimony that dancing was not permitted while musical entertainment was being performed.

The entertainment contracts introduced into evidence did not specify the type of music that was to be performed, that is, whether dance music or merely instrumental music. The jury therefore had to weigh the testimony of the witnesses in deciding whether music *and* dancing had occurred at Porky's Hideaway. Since there was a conflict in the evidence as to whether dancing was permitted or had actually occurred we do not know, nor will we speculate, as to what weight, if any, the jury accorded the entertainment contracts to assist in that determination.

In the circumstances of this case, we question whether the district court should have admitted into evidence the musicians contracts and allowed them to be considered by the jury.

C. The government offered into evidence two charts and a graph summarizing evidence to demonstrate that virtually all of the defendant's sales were after 9:30 p. m.; subject to the excise tax and that the defendant had under-reported the taxes owed. Special Agent Harrison prepared these summaries based upon information contained in the defendant's sales journal and information that appeared in the defendant's excise tax returns.

The charts were admitted into evidence over the defendant's objection.

On appeal, Baines argues that the charts and the graphic illustration summarizing the special agent's computations and admitted into evidence over his objections were offered and used before the jury as primary proof of his unreported tax liability and that they should be condemned as prejudicial, since the court permitted them to acquire an existence of their own, independent of the evidence which gave rise to them. Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. *See also* Lloyd v. United States, 5 Cir. 1955, 226 F.2d 9; Steele v. United States, 5 Cir. 1955, 222 F.2d 628.

Baines specifically alleges that Special Agent Harrison did not merely attempt to summarize the information contained in Baines's records and tax returns, that on the contrary he undertook to evaluate it and to invest

these exhibits with an air of credibility as demonstrative evidence over and above, and independent of, the evidence which they purported to summarize and embody, with the undoubted effect of completely erasing from the minds of the jury, as to the so-called exhibits, any therapeutic effect the charge to the jury that the exhibits were not original evidence and were not binding upon the jury, was intended or calculated to have.[7]

Although this Court has adopted the general rule that the admission of charts summarizing a revenue agent's computations is discretionary with the trial court, and that its rulings are subject to review only upon a clear showing of abuse and resulting prejudice to an accused, we are not being unmindful of the fact that the use of this type of evidence has inherent dangers to an accused. A jury may be unduly impressed by the apparent authenticity of a government witness' chart computations, as such, rather than by the truth and accuracy of the *underlying facts* and figures supporting them.

It is apparent from an examination of the charts and its graphic illustration that these were intended to play an integral part in the government's case towards proving a deficiency in the defendant's excise tax. It is true that to a large extent the figures appearing in these summaries were the product of records already introduced into evidence, but it is also true that figures representing what the defendant should have paid as well as Harrison's conclusions were based upon the assumption that *all* after 9:30-sales were subject to the tax. It was this very assumption however which the government was required to

prove beyond a reasonable doubt as an operative fact of the alleged offense.

We do not dispute Special Agent Harrison's ability to testify as to conclusions based upon mathematical computations. The danger of Special Agent Harrison's testimony *in the circumstances of this case* is that the jury may accept such unsworn conclusionary verbiage as authentic, primary proof. Lloyd v. United States, 5 Cir. 1955, 226 F.2d 9, 17.

The issue as to whether "Porky's Hideaway" was continuously operating as a cabaret after 9:30 was hotly contested. The charts were used in combination with Agent Harrison's testimony and analysis that all of the defendant's after 9:30 sales were subject to the tax. In the minds of the jurors the charts could have acquired an existence of their own as affirmative evidence that "Porky's Hideaway" had in fact achieved cabaret status every night after 9:30.

■ Our observation is in no way intended to undermine the general rule in this Circuit that the admission of such summaries is a matter of judicial discretion and that a trial court's judgment will not be reversed unless abuse is shown. Moreover, we pretermit a decision as to whether that discretion was abused in this case and whether the appellant suffered such prejudice from the use of these charts, *standing alone,* as would justify a reversal.

D. The appellant contends that the district court erred in admitting into evidence certain cabaret tax returns and Florida sales tax returns for periods immediately preceding and following the period covered by the indictment. The government contends that these tax returns were properly introduced into evidence to demonstrate a pattern of fraudulent conduct and could therefore be considered by the jury on the issue of willfulness or intent.

The government contends that the excise tax returns for 1958, 1959, and 1960

7. Steele v. United States, 5 Cir. 1955, 222 F.2d 628, 630.

covered periods for which income figures were available from Baines's income journal and that these returns were offered to show that the taxpayer had a longstanding practice of reporting only a small portion of the sales after 9:30. With respect to the Florida sales tax returns, the government allegedly sought the introduction of these for the purpose of comparing them with the excise tax returns which were filed for the same taxable period to demonstrate that if the sales tax returns were correct then the excise tax returns must be incorrect and that the taxpayer had knowledge of this fact.

This Court has approved the general rule of allowing evidence of other crimes and acts to be admissible into evidence to show an accused's criminal intent "as to the offense charged, where the other offenses are similar to and not too remote from that charged and where intent is an element of the offense charged." Weiss v. United States, 5 Cir. 1941, 122 F.2d 675, cert. denied, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550. In Flemister v. United States, 5 Cir. 1958, 260 F.2d 513, this Court held that it was reversible error for the jury to hear evidence of understatements of income and computations of underpayment of tax as to a taxable year the prosecution for which was barred by the statute of limitations. We believe that implicit in that decision is this Court's apprehension of the prejudicial effect that prior tax returns *may have* on a current criminal tax prosecution. The problem comes sharply into focus where, as here, evidence available for the years covered in the indictment is similarly available for the earlier and latter years. Thus, if the jury were to find that a taxpayer's return for the year in question was false, it would similarly conclude that the other tax returns were false thereby indicating a course of conduct in establishing either intent or willfulness. The net result of this is to place upon the defendant the onerous task of defending against evasion charges which are not the subject of the indictment.

The introduction into evidence of the Florida sales tax returns causes us additional concern. When these returns were introduced into evidence, the United States Attorney stated that they were not offered to show that they were incorrect. Rather, the returns were offered for comparison with the excise tax returns. The jury, however, was confronted with the testimony of Baines's former accountant as to the correctness of the figures that appeared on the sales tax returns and the government's closing argument to the jury which alluded to the sales tax returns and their being either too low or incorrect. The court's instruction to the jury referred to both the sales and excise tax returns and to the fact that they were alleged to be false. Although no objection was made by the defendant to the court's statement as to the alleged falsity of the tax returns, the testimony of Baines's former accountant as well as the government's closing remarks to the jury may have sufficiently left an impression in the minds of the jurors that these sales tax returns were false. The defendant therefore was placed in a position of having to defend himself against a charge for which he was not being tried.

We shall not attempt to calculate the prejudice the defendant may have suffered from the introduction into evidence of these tax returns.

\* \* \*

Although the record indicates that there is evidence from which a jury could find the defendant guilty, it is not this Court's function to determine the accused's guilt or innocence.

We are not authorized to look at the printed record, resolve conflicting evidence, and reach the conclusion that the error was harmless because we think the defendant was guilty. That would be to substitute our judgment for that of the jury and under our system of justice, juries alone have been entrusted with that responsibility.

Weiler v. United States, 1945, 323 U.S. 606, 611, 65 S.Ct. 548, 551, 89 L.Ed. 495,

499. *See also* Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Mole v. United States, 5 Cir. 1963, 315 F.2d 156; Wilson v. United States, 9 Cir. 1957, 250 F.2d 312.

We have concluded, after a careful study of the record, that the cumulative effect of the district court's errors and near-errors requires that a case as close as this case involving a cabaret tax be reversed and remanded for a new trial.