UNITED STATES of America,
Plaintiff-Appellee,

v.

George D. MERIWETHER, Defendant-
Appellant.

No. 72-2474.

United States Court of Appeals,
Fifth Circuit.

Oct. 23, 1973.

Rehearing and Rehearing En Banc
Denied Dec. 7, 1973.

Fournier J. Gale, III, Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., court appointed for defendant-appellant.

Wayman G. Sherrer, U. S. Atty., Birmingham, Ala., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Dept. of Justice, Washington, D. C., Henry I. Frohsin, Asst. U. S. Atty., Birmingham, Ala., Robert E. Lindsay, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Meriwether was convicted by a jury for willfully attempting to evade his and his wife's federal income tax for the years 1962, 1963, and 1964, by filing false returns in violation of 26 U.S.C. § 7201. We reversed that conviction and remanded the case for a new trial.[1]

Upon retrial, the government premised its case upon the same three-count indictment utilized in the first trial,[2] but relied exclusively upon specific items of income received to prove its case, declining altogether to use the net worth theory. which we had held was insufficiently proven in the first trial. Again, Meriwether was convicted by a jury on all three counts, and was sentenced to three concurrent three-year terms of imprisonment.

Prior to and during the indictment years, Meriwether was vice-president of the First National Bank of Tuscaloosa, Alabama, in charge of the installment loan department. The prosecution undertook to prove that Meriwether demanded and received money from specific bank customers as a condition for handling their commercial paper, and that these sums received were never reported as income. Meriwether allegedly received payments in varying amounts from J. B. Carl, Henry Dozier, and Raburn Hall from 1962 through 1964.

I

The bill of particulars claimed that Meriwether had received from J. B. Carl and his company, Dixie Air, Inc., a total of $8,436.12 in 1962. At trial, proof was offered that Meriwether had received $11,426.12 in 1962 from Carl. These sums represented significantly more than half of Meriwether's allegedly unreported income during 1962, the period covered by Count 1 of the indictment.[3] The alleged income from Carl being such a substantial portion of the government's case on Count 1, the insufficiency of this evidence would require us to reverse the conviction as to this count.

---

1. United States v. Meriwether, 440 F.2d 753 (5th Cir. 1971).

2. Count 1 (1962) charged that Meriwether reported their joint taxable income as $9,522.72, on which the tax owed was $2,065.91, when he knew that their joint taxable income was $16,542.72, on which the tax owed was $4,104.52.
 Count 2 (1963) charged the reported taxable income as $9,803.67, as compared with actual

income of $24,005.58, and reported tax to be $2,137.04, as against tax owed of $6,790.40. Count 3 (1964) charged that the income reported was $6,274.32, as against actual joint taxable income of $8,948.62, with tax reported of $1,127.86, as against tax owed of $1,674.43.

3. The indictment also alleged that Meriwether received $6,500 from Dozier and $250 from Ball during 1962.

■ J. B. Carl having died prior to the time of trial, the government's case concerning 1962 payments by Carl to Meriwether consisted entirely of circumstantial evidence. While it cannot be doubted that the jury could convict Meriwether of receiving these payments solely on the basis of circumstantial evidence, it could not convict him if this evidence was not "sufficient to exclude in the minds of the jury every reasonable hypothesis other than guilt of the defendant." Ford v. United States, 210 F.2d 313 (5th Cir. 1954).

■ The sole evidence before the jury concerning the alleged payments by Carl to Meriwether [4] came from Jim Kirby, a First National Bank employee in the installment loan department who had subsequently become vice-president in charge of that department. Kirby testified that particular checks made out to J. B. Carl were never deposited in the Dixie Air reserve account. He also explained in depth the mechanics within the bank of the reserve account agreement.

Dixie Air, Kirby testified, had entered into a dealer financing agreement with the bank. Under the terms of that agreement, the difference between the rate of interest charged by the bank and the rate charged by the dealer to its customer was to be withheld and deposited in a reserve account. This account protected the bank against contingent liability of the endorsing dealer, who would be liable for the commercial paper in the event of default by the purchaser of an airplane purchased from Dixie Air. Defendant Meriwether, as vice-president in charge of the installment loan department, was in 1962 responsible for preparation of the agreement setting up a four and a half percent reserve fund for Dixie Air. Thus, the jury could reasonably infer that Meriwether did know of Dixie Air's obligation to deposit the checks in controversy in its reserve account. Kirby's testimony also showed that, when the bank made out checks for the amount of the difference between the two rates of interest, these were approved at the bottom by Meriwether before being cashed at various teller's windows by J. B. Carl.

Kirby refused, however, to draw any inference from the bank's practices to the effect that Meriwether's knowledge of the reserve agreement or approval of the checks would require that Meriwether investigate the status of Dixie Air's reserve account. Moreover, noting that his testimony was derived only from the records of the bank, Kirby declined to infer that Meriwether had received any of the checks cashed by J. B. Carl which were not deposited, as the agreement required, in the reserve account.[5] Despite

4. Evidence concerning payments by Dozier to Meriwether from another reserve account of a different company can, of course, prove nothing concerning payments by Carl to Meriwether. They might, however, under proper circumstances, show that Meriwether had an obligation to handle reserve accounts in a particular way.

5. Q. Now, Mr. Kirby, in your sixteen years experience in the bank, . . . is it not the custom and practice and was it not the custom and practice at the time these transactions took place that when a dealer in aircraft such as this or any other dealer of vehicles brings to the bank a deal as I believe it is called in the trade or a contract which it sells to the bank, is not that dealer paid a commission?

A. We rather refer to it as a finance participation rather than a commission. The difference between the amount of interest charged by the dealer and the amount that we charge to handle the paper.

Q. Now with regard—whatever you call it, he is paid an amount of money for bringing that deal to the bank, is he not?

A. Yes, sir.

Q. Now isn't that what happened here in each of these cases, isn't these—

A. Checks were written for the amount of difference between the interest charged and the amount that we got for handling it.

Q. That's right. In other words, that was his commission—well, call it participation in the financial arrangements,

Kirby's disclaimers, the court admitted his testimony on this very limited basis:

> The court, however, indicating that at this point in time *it hasn't been shown to be relevant to what the defendant is charged with,* and that although it is allowed into evidence, that allowance is *conditional upon there being other evidence* presented in the case which might connect this to the defendant. (Emphasis added).

No such further evidence was ever introduced. The government does not contend that any further evidence was admitted concerning the payments to Carl, but argues that evidence concerning other specific transactions (payments by Dozier and Hall to Meriwether) gave the jury sufficient evidence to infer that Meriwether received Dixie Air's reserve fund payments.

■ This evidence was not sufficient to go to the jury. There was not even a connecting inference between the cashing of the checks and any receipt of Meriwether of unreported cash income. J. B. Carl, from the evidence presented, could have kept the cash himself or could have channeled it back into Dixie Air for other purposes. The only theory which might support the inference the jury evidently drew would be that of

that was his participation in the financial arrangement?

Q. That was his commission paid for bringing to the bank a piece of paper which the bank bought?

A. Yes, sir.

Q. Now that really isn't unusual, that is the way it is done, isn't it?

A. Ordinarily this money is placed in the reserve against—

Q. Well, if there is an agreement to place it in reserve?

A. Yes, sir.

Q. Then he still is being paid, and what he does with it then or whatever agreement has been made is beyond the agreement of paying him?

A. First there is an agreement to pay him, yes, sir.

Q. Then you have another agreement that when we pay you, you must take that amount and place it over here as security for bad debts, now that is another agreement, is it not?

A. Right. . . .

Q. You don't mean—all these checks were made payable to Dixie Air or to J. B. Carl?

A. Yes, sir.

Q. And all of these checks were cashed by J. B. Carl?

A. Cashed or handled in L & D.

Q. He asked you a question about how could you get an official check in L & D 2, that is installment loan which we are talking about?

A. Yes, sir.

Q. You can cash a check down there, can you not?

A. Yes, sir, you can cash a check.

Q. And that is what you had here, is it not?

A. I won't say that. I didn't say that. It was handled in the department. It could have been—could have been cashed, could have been deposited in the L & D 2. This stamp only shows this stamp went through L & D 2 on that particular day. [The teller's stamp].

Q. There is nothing on those checks to show it went to Mr. Meriwether, is there?

A. No, sir.

Q. Nothing at all, is it?

A. No, sir.

Q. And you don't mean by your testimony to infer that this money went to Mr. Meriwether are you, sir?

A. Sir, I'm testifying from the records of the bank.

Q. *I just want to get this straight. As far as the records show, as far as your knowledge is concerned, these checks were either paid to Mr. Carl, cashed by him and paid to him, or either handled through the L & D?*

A. *Yes, sir.*

Q. There is nothing wrong with the bank —nothing wrong with cashing a bank official checks, in the Loan Department is there?

A. No, sir . . . .

Q. Would you just glance down at it [the Dixie Air reserve account] and see if it doesn't appear to be a — an average balance in that reserve account of about $30,000?

A. The sheets I have here would be an average of $30,000 plus.

Q. At least $30,000?

A. Yes, sir. . . .

Q. . . . I will ask you do the checks show what Mr. Carl did with the money?

A. No, sir.

"once a thief, always a thief." To convict a man of a felony on no more than this theory plus the fact that he was a responsible employee in the bank where the check was cashed would permit a conviction to be based on pure surmise. There is just nothing here to permit the jury the jury to draw an inference that Meriwether received funds illegally from Carl.

Under similar circumstances, we have held that evidence was insufficient to convict a defendant. In Ford v. United States, *supra,* a witness testified that she had left $100 in cash "at the defendant's office" and that she had made regular payoffs "to the police department" of $100 per month. The connection sought to be made was that the defendant, a former police chief, had received these payoffs. The court held that there was insufficient evidence connecting the defendant with the payoffs, and that admission of this evidence was both erroneous and highly prejudicial.

> There was no sufficient proof that the defendant received the payoffs or any part of them, and a conclusion to that effect cannot be permitted to be based upon mere conjecture or suspicion. We have previously had occasion to comment on the necessity for safeguarding a defendant against the prejudice and danger inherent in this type of testimony. Montgomery v. United States, *supra*, 203 F.2d [887] at page 891. . . .
>
> The evidence sufficiently disclosed that in the defendant's office of Chief of Police he had opportunities of receiving income from graft, payoffs, or other illegal sources. There can, of course, be no presumption that the defendant was guilty of such gross misconduct as to be the recipient of such ill gotten gains. The presumption is to the contrary. It was nevertheless within the jury's province to say whether that presumption had been

overcome, or to infer that the defendant had some other source of income, from the testimony that the expenditures so far exceeded the available resources disclosed by the evidence, and from the evidence that such expenditures could not be accounted for by accumulated assets or by non-taxable receipts. But to undertake to aid the jury in this function by the admission of testimony of this woman as to payoffs with which the defendant was not shown to be connected was both erroneous and highly prejudicial. Ford v. United States, 210 F.2d at 317–318.

See also Blumberg v. United States, 222 F.2d 496 at 500 (5th Cir. 1955).

We cannot view this as a case in which there was evidence that the illegal payments were known to have been received by the defendant, as in Azcona v. United States, 257 F.2d 462 (5th Cir. 1958), or a case in which the jury was admonished to disregard the prejudicial testimony and where independent evidence of unreported income during the indictment period was sufficient to show unreported taxable income. United States v. Ford, 237 F.2d 57, 67 (2nd Cir. 1956). We therefore reverse the conviction as to Count 1 of the indictment.

## II

On Count 3 of the indictment, the government alleged that Meriwether had in 1964 received $3,000 in unreported income from Henry Dozier. The evidence adduced to support this charge was totally insufficient, a position which the government virtually admits.[6] In response to a question by the prosecution as to whether this amount was paid to Meriwether on February 4, 1964, Dozier said:

> A. I do not know I couldn't say this particular one. I would have to refer back to my books.

Thereafter, the trial court allowed Dozier to review testimony at the first

6. The government's brief includes the following statement: "The Government is unable to say with certainty that there is no merit in taxpayer's contention . . . that the

specific items proof for 1964 was insufficient to establish a deficiency in reported income and tax."

trial, after which the following exchange occurred:

Q. Having read those particular passages referred to, can you tell us whether or not your recollection is refreshed, whether or not you actually paid the $3,000.00 as of February 4, 1964, to the defendant, George Meriwether?

A. The only way I can answer it honestly is if it shows on my journal sheets, that is correct. From memory I cannot say about this check. But if it is on any journal, that is correct.

The journal sheets were never admitted in evidence, and Dozier, the sole witness on Count 3 of the indictment, was thus unable to testify as to this $3,000 payment. There was, therefore, no evidence upon which the jury could have found Meriwether guilty on Count 3 and this count should not have been submitted to the jury.

### III

Having reviewed and carefully studied all of defendant's contentions, we are in the position of reversing his convictions on Counts 1 and 3 of the three-count indictment, leaving only the second count standing. This situation raises the issue of cross-count prejudice. Although we find that there were no errors committed with respect to the second count itself, there is the possibility that evidence introduced with respect to the first and third counts fatally "infected" the deliberations about the second count.

■■ Defendant argues that Count 2 must be reversed for two reasons (in addition to his arguments relating to Count 2 alone, which we reject). First, he argues that evidence was introduced with respect to the first and third counts which would have been irrelevant had he been tried on the second count standing alone. This argument is without merit because the trial court clearly instructed the jury that each of the counts must be considered by itself, and each one must be supported by suffi-

cient evidence and proven beyond a reasonable doubt. Whenever a defendant is tried on a multi-count indictment there is the possibility that the jury will infer guilt on all counts from guilt on one of the individual counts, but this danger has not led us to abandon the practice of using multi-count indictments in proper circumstances.

In addition, we take into consideration the fact that the second count was by far the most substantial of the three. The amount by which defendant's actual income is alleged to have exceeded his reported income is more than $14,000 for that year, while the surplusage in Count 1 was only a little more than $7,000 and in Count 3 it was less than $2,700. The excess tax alleged to be due in Count 2 was more than $4,600, while in Count 1 it was a little more than $2,000 and in Count 3 it was less than $600. There was ample evidence to support the conviction on this count, and we see nothing to convince us that consideration of the other two counts improperly affected conviction on this count.

■ We do not understand defendant to argue that it was improper to use a multi-count indictment against him in the first instance, and indeed, such an argument would be unavailing. All three counts were for violations of the same statute allegedly committed in three consecutive years. There was nothing improper about trying defendant for all three alleged crimes in the same proceeding.

■ Defendant also argues, that the introduction into evidence of Government Exhibit 179 was error requiring reversal of the second count. The exhibit is a three-page Summary of Income, Cash Deposits and Cash Expenditures of the defendant, which provides a month-by-month description of the financial dealings of the defendant for the years in question. Defendant's allegations of error with respect to the chart fall into two categories. First, he complains of specific items of misinformation included and items not supported by

the evidence which were included in the chart. In addition, he argues that admission of the chart into evidence was prejudicial because it failed to make any allowance for cash on hand at the beginning or end of the taxable years.

Each of the allegedly incorrect entries related to the first and third counts of the indictment. Because we reverse defendant's conviction on those counts on other grounds, the errors in the chart are of no moment, unless improper admission of the sections of the chart dealing with the first and third counts infects the section of the chart dealing with the second count. But we find that this is not the case. The chart was actually three separate sheets of paper, each dealing with a separate year. In fact, the three pages are stapled together, so it is difficult to even look at all three pages simultaneously. The district judge instructed the jury correctly and explicitly that they were to consider the merits of each count of the indictment separately, and there is no reason to think that they failed to follow his instructions. The admission of summarizing charts such as Exhibit 179 rests in the discretion of the trial court, both abuse of discretion and resulting prejudice being required for reversal. Baines v. United States, 426 F.2d 833 (5th Cir. 1970). Appellant has demonstrated neither.

 Appellant has also alleged that the chart was defective because it did not include figures for cash on hand at the beginning and the end of each taxable year. But this allegation would have merit only in a case in which the government used a net worth or cash expenditures method ·of proof. Here, unlike the first trial of this case, the government relied entirely on the specific

items method, attempting to show that appellant received specific sums from specific people on specific occasions. This reliance was made explicit in the government's bill of particulars and ably explained in the court's charge to the jury. In such a case, the failure to include figures for net worth or cash on hand at the beginning and end of the taxable years cannot possibly have prejudiced the defendant.

## IV

Defendant also alleges that the government violated F.R.Crim.P., Rule 17(b) regulating the issuance of subpoenas requested by defendants unable to pay for them [7] in that an Assistant United States Attorney was present during defendant's oral application to the court for subpoenas issued at government expense. Before its amendment in 1966, the rule required that all defendants proceeding *in forma pauperis* who request subpoenas issued at government expense must support such requests with affidavits "in which the defendant shall state the name and address of each witness and the testimony which he is expected by the defendant to give if subpoenaed, and shall show that the evidence of the witness is material to the defense . . .." The difficulty with this procedure was that it required indigent defendants to reveal many of the theories of their defense to the prosecution, although defendants able to pay for witnesses were able to have blank subpoenas issued. F.R.Crim.P., Rule 17(a). To cure this inequitable situation, Congress amended the rule· in 1966 to provide that applications for subpoenas by defendants unable to pay for them be made to the court *ex parte*. The government asserts that *ex parte* means only

---

7. Rule 17(b) provides:
 Defendants Unable to Pay. The court, shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense. If the court orders the subpoena to be issued the costs incurred by the process and the fees of the witness so subpoenaed shall be paid in the same manner in which similar costs and fees are paid in case of a witness subpoenaed in behalf of the government.

that the prosecutor should not participate in the discussions about the subpoenas, although he may be present during the argument. But this interpretation of the rule conflicts with both the general understanding of the term *ex parte*, and with the purpose of the 1966 amendment to the rule. Black's Law Dictionary (4th Ed., 1968) defines *ex parte* as meaning: "On one side only; by or for one party; done for, in behalf of, or on the application of, one party only."

■ *"In its more usual sense, ex parte* means that an application is made by one party to a proceeding *in the absence of the* other. [Emphasis added]." In addition, we would defeat the purpose of the amendment to the rule if we upheld the government's contention. The *ex parte* provision of the rule was not intended to protect the defendant from opposition from the prosecutor; it was intended to shield the theory of his defense from the prosecutor's scrutiny. Allowing the prosecutor to observe the defendant's support of his motion permits this scrutiny, even when the prosecutor remains silent. The government urges us to hold that because the prosecutor was excused from the room on several occasions when the defendant had to explain to the judge why he wanted a certain witness to be subpoenaed, the procedure used did not require the defendant to reveal the "theory" of his defense. This we decline to do. The names of witnesses to be called by the defendant could easily aid the government in determining the strategy the defendant plans to use at trial. The government should not be able to obtain a list of adverse witnesses in the case of a defendant unable to pay their fees when it is not able to do so in the cases of defendants able to pay witness fees. When an indigent defendant's case is subjected to pre-trial scrutiny by the

prosecutor, while the monied defendant is able to proceed without such scrutiny, serious equal protection questions are raised, and it appears that a major reason for the amendment was to avoid such questions.[8] See Douglas v. People of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) and Griffin v. People of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). We note that the Court of Appeals for the First Circuit has announced a like interpretation of the rule. Holden v. United States, 393 F.2d 276 (1st Cir. 1968). See also United States v. Sutton, 464 F. 2d 552 (5th Cir. 1972).

The district judge to whom this case was transferred after the first trial seems to have accepted defendant's interpretation of the rule, for on May 10, 1972, he ruled that all further proceedings under the rule would be held in the absence of the prosecutor. However, the court held that the defendant had waived all objections to past violations of the rule in spite of the fact that the defendant on February 7, 1972, had filed a motion to exclude the prosecutor from the Rule 17(b) proceedings.

■ It is not necessary to decide the questions of waiver, however, since in order to obtain a reversal of the conviction, defendant is required to show that he was prejudiced by the failure to comply with the rule. Here he has failed to make such a showing. The major factor which causes us to reach this conclusion is that this was not the first, but the second trial of the same charges against the defendant. Although the theory of the prosecution was different on re-trial, the essential facts sought to be proved by the government were virtually the same. In both cases, the government attempted to show that the defendant received payments from customers of the bank in return for the processing of

---

8. The advisory committee notes to rule 17 include the following observation: "Criticism has been directed at the requirement that an indigent defendant disclose in advance the theory of his defense in order to obtain the issuance of a subpoena at government ex-

pense while the government and defendants able to pay may have subpoenas issued in blank without any disclosure. See Report of the Attorney General's Committee on Poverty and the Administration of Criminal Justice (1963) p. 27."

their loan applications, and that the defendant failed to report these sums as income on his federal income tax return. Most of the witnesses subpoenaed by the defendant were already known to the government. In short, although the presence of the Assistant United States Attorney at application proceedings held under Rule 17(b) violates the rule, we find that the defendant in this case was not prejudiced by such breach, and his conviction cannot be reversed on these grounds.

We have examined the first of defendant's arguments, including the allegations that certain statements were taken from him in violation of the rule of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and find them all to be without merit.

The judgment with respect to the first and third counts of the indictment is reversed and the case is remanded for further proceedings not inconsistent with this opinion; the judgment with respect to the second count of the indictment is affirmed.